**Martin Ray PERALES, Appellant**

v.

**The STATE of Texas, Appellee.**

No. 01–05–01019–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 14, 2006.

raised in Methodist's brief.

Angela Lee Williams, Houston, for Appellant.

Carol M. Cameron, Assistant District Attorney, Houston, for State.

Panel consists of Justices TAFT, KEYES, and HANKS.

## OPINION

TIM TAFT, Justice.

Pursuant to Texas Rule of Appellate Procedure 50, we have reconsidered our previous opinion on the filing of appellant's petition for discretionary review, which was filed in this Court on November 30, 2006. *See* TEX.R.APP. P. 50. We withdraw our opinion and judgment dated November

2, 2006 and substitute the following opinion and judgment in their place. *See id.*

A jury convicted appellant, Martin Ray Perales, of indecency with a child, and the trial court assessed punishment at two years in prison. *See* Tex. Pen.Code Ann. § 21.11 (Vernon 2003). We determine whether the evidence was factually sufficient to show that appellant was guilty of indecency with a child and whether the trial court erred in refusing to grant funds to appellant for the purpose of hiring an expert witness. We affirm.

### Facts

Because this case involves a challenge to the factual sufficiency of the evidence, all relevant facts are set out herein.

April Ybarra married appellant in 1996, and they had two children, L.P. and B.P. April and appellant divorced in 2001. After the divorce, April retained custody of the children, and appellant was allowed visitation on alternate weekends. April married Adam Ybarra in 2002. April, Adam, L.P., B.P., and Robert Nieto, April's grandfather, all resided in an apartment in Pasadena, Texas. L.P. and B.P. referred to Adam Ybarra as "Dad" or "Daddy" and to appellant as their "other father." Adam and April had spoken about Adam's adopting the girls, but in order for him to adopt them, appellant would have had to terminate his parental rights voluntarily, which he was unwilling to do.

In January of 2005, L.P., who was seven, and B.P., who was five, returned home from a visit with appellant, and L.P. began shaking and crying. L.P. told her mother nothing was wrong and eventually calmed down and went to bed. The next evening, when April was at a nighttime college class, L.P. approached Adam and told him that appellant had touched her on her chest and genitals. Adam called April,

and she left class and returned home. April then questioned L.P. and B.P. about the incident with appellant. L.P. repeated to April what she had told Adam; B.P. did not say anything. L.P. also said that appellant had told her not to tell, but appellant later denied that allegation. Soon afterward, L.P. began to be afraid to go to the bathroom alone, she started having nightmares and trouble sleeping, and she was anxious.

The day after L.P. had told April and Adam that appellant had touched her, April and Adam contacted the police. They were instructed to file a report with Child Protective Services ("CPS"), which they did. Afterwards, a forensic interviewer affiliated with CPS interviewed L.P. alone. Police officers then spoke with L.P., April, and Adam. On March 2, 2005, L.P., April, and Adam visited psychotherapist Jennifer Pinotti–Sanders to have L.P. evaluated and treated for nightmares and anxiety. L.P. slept through most of the 45–minute session because she was ill with a cold. Thus, Pinotti–Sanders obtained most of her information about L.P.'s allegation and symptoms from April and Adam. Based on that information, Pinotti–Sanders diagnosed L.P. with post-traumatic stress disorder. After the initial evaluation, L.P. had one other appointment with Pinotti–Sanders. Additionally, L.P. saw a psychiatrist, Dr. Daniel Koppersmith, who corroborated Pinotti–Sanders's diagnosis and prescribed medicine to help L.P. sleep. L.P. had two visits with Koppersmith.

Meanwhile, police contacted appellant and asked him to come to the police station to discuss the allegation of sexual abuse. The precise reason for the meeting was not discussed on the telephone. Appellant went to the police station voluntarily and spoke with police in an effort to resolve the case. When he arrived, appellant found out for the first time that L.P. had claimed

that he had touched her inappropriately. Police conducted two separate interviews with appellant. During the first interview, Detective Tim Brinson interviewed appellant for about 45 minutes. During the second interview, Officer Jerry Wright and Detective Brinson both spoke to appellant for approximately two and one half hours. At the beginning of the meetings with police, appellant vehemently denied that he had touched L.P. After a while, he admitted that he and L.P. had been playing on the bed, that she had begun to fall, and that he had "used [his] hand to catch her and held her vagina." After continued questioning, appellant finally stated that he had touched L.P. and that he knew that it was wrong.

L.P. was questioned about the sexual abuse by at least five different persons on separate occasions, and certain details of her story were inconsistent. At different times, L.P. said that she was at home, that she was at the house of a "Grandma Alice," that she and appellant had been playing, or that she had been reading a book. However, L.P. maintained every time that it was appellant who had touched her on her chest and genitals.

### Factual Sufficiency

We address appellant's second point of error first. In his second point of error, appellant claims that the evidence was factually insufficient to prove indecency with a child, specifically, that the jury could not infer intent from the evidence offered.

### A. The Standard of Review

When conducting a factual-sufficiency review, we view all of the evidence in a neutral light. *Cain v. State*, 958 S.W.2d 404, 408 (Tex.Crim.App.1997). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2)

the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App. 2000). Under the first prong of *Johnson*, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim. App.2006). Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Id.* Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson*, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* In conducting a factual-sufficiency review, we must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

We may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App.2000). The fact-finder alone determines what weight to place on contradictory testimonial evidence because that determination depends on the fact-finder's evaluation of credibility and demeanor. *Cain*, 958 S.W.2d at 408–09. As the determiner of the credibility of the witnesses, the fact-finder may choose to believe all, some, or none of the testimony presented. *Id.* at 407 n. 5.

### B. The Law

A person commits indecency with a child if that person has sexual contact with a child younger than 17 who is not that person's spouse. Tex. Pen.Code Ann.

§ 21.11(a)(1) (Vernon 2003). Sexual contact means any touching, including touching through clothing, of the anus, breast, or any part of the genitals of the child, if the act is committed with the intent to arouse or to gratify the sexual desire of any person. *Id.* § 21.11(c)(1) (Vernon 2003). Intent to arouse or to gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks, and all surrounding circumstances. *McKenzie v. State,* 617 S.W.2d 211, 216 (Tex.Crim.App.1981).

### C. Inference of Intent

 Appellant argues that the evidence does not show that he intended to arouse or to gratify anyone's sexual desire because one cannot infer intent from appellant's statement to police. However, such intent may be inferred from the defendant's conduct, his remarks, and all surrounding circumstances. *See id.*

The jury could have inferred intent from appellant's statements to the police. When appellant began talking to police, he denied ever having touched L.P. at all. Gradually, the denials grew weaker, and he offered an explanation: he and L.P. had been playing, she started to fall, and he had caught her and held her vagina. After continued questioning, he stated that he had touched her and knew it was wrong. Appellant was concerned that he could "go to jail for it"; he agreed that thinking sexual thoughts about his daughter and having sexual contact with her was wrong. He admitted that he had started to get an erection as he held her vagina, but realized that it was wrong and stopped. When detectives asked appellant what he would say to L.P. if she were there, appellant expressed a desire to tell L.P. that he was sorry, that he loved her, and that the

inappropriate touching would never happen again.

The jury could also have inferred intent from the surrounding circumstances. L.P. testified that she had told appellant to stop touching her, although appellant told the police that L.P. had not said anything. L.P. also testified that appellant had told her not to tell, although he denied it.

Appellant attempts to distinguish this case from others in which intent could be more easily inferred from unusual or lascivious behavior, such as when a stranger, instead of a parent or caregiver, touches a child's genitals. However, the jury was the judge of the weight of the evidence and of the credibility of the witnesses. *See Cain,* 958 S.W.2d at 407. A rational jury could have found beyond a reasonable doubt that appellant touched L.P. with the intent to arouse or to gratify his sexual desire, based on appellant's conduct, remarks, and the surrounding circumstances. Simply because cases exist in which more extreme conduct occurred—that is, in which intent to arouse or to gratify sexual desire could be more easily inferred—does not mean that a jury could not have inferred intent from the facts of this case.

We overrule appellant's second point of error.

### Denial of Request for Expert–Witness Funds

 In his first point of error, appellant contends that he was harmed by the trial court's denial of funds for an expert witness.

Appellant did not request, and the court did not appoint, counsel for appellant before or during trial.[1] Two days before trial began, retained defense counsel filed a written request for expert-witness funds. The request alleged that appellant could

---

1. Counsel was first appointed for appellant at the time of the filing of his notice of appeal.

not afford to hire an expert because he had exhausted his available funds and property in the prosecution of his defense. However, the motion was unverified, and no affidavit or other evidence in support of indigency status was attached. The trial court denied the motion the morning of trial, but the reporter's record contains no transcription of that ruling or hearing, and whatever transpired that morning concerning appellant's motion does not appear to have been recorded. It is thus unknown whether a hearing on the motion took place or, if so, whether any evidence was presented in support of it.[2]

 We review a trial court's ruling on an indigent defendant's motion requesting expert-witness funds (or the appointment of an expert witness) for abuse of discretion. *See Deason v. State*, 84 S.W.3d 793, 796 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd) (citing *Griffith v. State*, 983 S.W.2d 282, 287 (Tex.Crim.App.1998)). An indigent defendant has the right to have an expert appointed upon a preliminary showing that the matters that the expert will address will likely be significant factors at trial. *Rey v. State*, 897 S.W.2d 333, 339 (Tex.Crim.App.1995) (citing *Ake v. Oklahoma*, 470 U.S. 68, 74, 82–83, 86, 105 S.Ct. 1087, 1091–92, 1097–98, 84 L.Ed.2d 53 (1985)). However, a defendant must actually be indigent to be provided State funds for, or to have appointed, such an expert. *See, e.g., Ake*, 470 U.S. 68, 105 S.Ct. 1087 (indicating that rule established by Court applied to *indigent* defendants); *Hebert v. State*, No. 01–95–00599–CR, 1997 WL 149521, at *1 (Tex.App.-Houston [1st Dist.] Mar. 20, 1997, no pet.) (not designat-

ed for publication) (in overruling challenge to denial of *Ake* motion for lack of proof of indigency, indicating that "[a]lthough appointment of an expert to assist an indigent defendant is permitted, it is axiomatic that the defendant must *be* indigent.") (emphasis in original); *see also* Tex.Code Crim. Proc. Ann. art. 26.05(d) (Vernon Supp. 2006) (providing for reimbursement of *appointed defense counsel's* necessary expenses, including expenses for experts); *Green v. State*, 682 S.W.2d 271, 291 (Tex. Crim.App.1984) (in overruling challenge to denial of motion to appoint expert witness, reasoning that "[article] 26.05 provides that *court appointed attorneys* may be paid for certain expenses. No evidence of indigency was presented other than the appellant's unsupported allegations.") (emphasis added). If a defendant is not indigent, then *Ake* does not apply.

 It is the defendant's burden to show indigency if, as here, indigency has not already been declared by the court. *See Hebert*, 1997 WL 149521, at *1 (holding same, in review of denial of *Ake* motion)[3]; *cf. Ex parte Briggs*, 187 S.W.3d 458, 468 (Tex.Crim.App.2005) (in case involving ineffectiveness of retained counsel for failure to protect client's interests when client ran out of funds, indicating that counsel was deficient for, among other things, not having sought appointment of *Ake* expert after having proved up client's indigency status); *Atwood v. State*, 120 S.W.3d 892, 896 (Tex.App.-Texarkana 2003, no pet.) (indicating that defendant has burden to demonstrate indigency before court has duty to appoint counsel).

---

**2.** We note that appellant does not complain on appeal of the lack of a hearing on his motion or of the lack of a record of any such hearing.

**3.** The *Hebert* opinion is the only Texas authority that we have located that makes express

holdings concerning the burden to show, and the proof required for showing, the preliminary matter of indigency in an *Ake* motion. We thus adopt the reasoning and holding of the *Hebert* Court on the *Ake* issue.

To show indigency, an appellant must present more than simply an unverified allegation that his financial situation has changed. *See* Tex.Code Crim. Proc. Ann. art. 26.04(m) (Vernon Supp.2006) (providing that, in determining whether defendant is indigent for purposes of appointment of counsel, court may consider defendant's income, source of income, assets, property owned, outstanding obligations, necessary expenses, number and age of dependents, and spousal income); *Hebert,* 1997 WL 149521, at *1 (holding same, in review of denial of *Ake* motion); *see also Ex parte Briggs,* 187 S.W.3d at 468 (indicating in dictum that "the trial court undoubtedly would have permitted state-funded appointment of expert assistance under *Ake* had applicant's attorney *put on proof of his client's present indigency.*") (emphasis added).

Appellant presented no evidence in support of his unverified allegation of indigency, and he had not previously been declared indigent. We hold that the trial court did not abuse its discretion in denying appellant's *Ake* motion when that motion failed to make a preliminary showing of indigency.

We overrule appellant's first point of error.

## Conclusion

We affirm the judgment of the trial court.